Filed 5/27/14  Golden v. Loewen CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| DAN GOLDEN, | D063195 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. ECU04361) |
| CAL LOEWEN et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Imperial County, Donal B. Donnelly, Judge.  Affirmed.

Law & Mediation Offices of Paul G. Minoletti and Paul G. Minoletti for Plaintiff and Appellant.

David A. Kay for Defendants and Respondents.

Dan Golden appeals from a judgment against him following a bench trial in his lawsuit against the owners and operators of a mobilehome park.  Golden contends that he established a violation of the Mobilehome Residency Law (Civ. Code, § 798 et seq.)

(MRL)[1] as well as fraud and negligent misrepresentation, and that the trial court accordingly erred in granting defendants' motion for judgment after the close of Golden's evidence at trial (Code Civ. Proc., § 631.8). We conclude that Golden's contentions are without merit, and we accordingly affirm the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

Intending to use it as a vacation home, Golden purchased a double-wide mobilehome with a deck in 2005 for $36,000, located on space 47 of the Imperial Hot Mineral Spa mobilehome park in Niland, California (the Park). Golden entered into a lease in May 2005 for space 47 with a monthly rent of $176.

Cal Loewen became the new owner of the Park in mid-2007 and assumed the lease between the County of Imperial and the previous owners. Loewen created Sassy's Outback, Inc., dba Glamis North KOA (Sassy's Outback) to operate the Park.

As the new owner of the Park, Loewen sent a letter, dated July 7, 2007, to residents of the Park, including Golden, describing his renegotiation of the lease with the County of Imperial and certain changes that would be made to the Park (the July 7 letter). In relevant part, the July 7 letter stated, "After a year of working with the County of Imperial, [w]e were successful at getting the county lease renegotiated and assigned to us! As a condition of the assignment, we have agreed to a seven[-]year improvement plan at a cost in excess of 2 million dollars to complete." Following a discussion of

_____

1    Unless otherwise indicated, all further statutory references are to the Civil Code.

2

various planned improvements to the Park's hot springs pools and other facilities, the letter continued:

> "Our dedicated mobile home sites (143–234) shall remain Imperial Spa.
>
> "The RV sites (1–142) must be temporarily closed for renovation. Sites 1–26 are to be occupied by KOA Kabins. In sites 27–90 every other site will be removed and the remaining sites will be large pull thru- [*sic*] sites with patios (the new lease requires a franchise to insure the standards are maintained in the future).
>
> "If you have a home in site[s] 1–142 we recognize that moving your home is expensive and not something that you desire to do. To offset this expense, we are offering one year free rent from the date that your home is moved to any available site in the mobile home section. Sites will be available on a first come first served basis. This offer expires when all of the sites are full or November 1, 2007, which ever [*sic*] comes first. Starting November 1, 2007, all RV sites will be charged the published daily KOA rate. All homes sold must be moved from the KOA section at the time of the sale. If you desire this limited time offer of free rent, please contact Laura at the office . . . to make arrangements.
>
> "Effective 11/01/07 the annual monthly rate for sites 143–234 will be $265.00 plus tax and electric . . . ."

As Golden's mobilehome was in space 47, he understood from the July 7 letter that he was in one of the "RV sites," and as of November 1, 2007, his rent would be increasing dramatically. At the time he received the July 7 letter, Golden's monthly rent for space 47 was approximately $215. There was evidence at trial that the new KOA daily RV rate would be approximately $30 per day. As Golden explained at trial, "My understanding was that I had to go to the permanent home section or be charged an enormous amount of money to be a daily camper at a KOA section as sanctioned by the County of Imperial." Golden testified that he did not want to move his home, and in hindsight wishes he had not.

3

After he received the July 7 letter, Golden called the Park office and attempted to speak with Loewen, but Loewen was not available, so he spoke with the office managers at the Park. By the time Golden received the July 7 letter and contacted the Park office, there were only two spaces still available in the mobilehome section of the Park, both of which, in Golden's view, had drawbacks.

Golden found out from friends that he could move to space 180 if he paid $8,000 to buy a camper trailer from the person who currently occupied space 180. As Golden liked space 180 more than the two spaces that were available through the Park office, on July 16, 2007, Golden paid $8,000 to buy the trailer from the person who was leasing space 180, and after checking with the Park office, Golden was assigned the right to occupy space 180.

Golden paid a company $14,100 to move his mobilehome to space 180 in September 2007. Golden could not use the mobilehome for approximately three months while it was being moved, and he had to move his furniture and other items from the mobile home, which cost approximately $1,200. Golden's mobilehome remains on space 180.[2]

---

[2] According to Golden, although he asked Loewen to enter into a new written lease with him for space 180, Loewen refused. Golden testified that he has received no communications about his rental rate, and as of trial in 2012, ever since he moved to space 180 in September 2007, he has only received three invoices from the Park, which he paid, in the amounts of $4.01 on September 2, 2007; $41.33 on February 21, 2008; and $26.59 on April 22, 2008.

4

Although many of the residents of spaces 1 through 142 ended up moving from their spaces to the dedicated mobilehome sites, at least three of them stayed in the new "RV sites." At trial, Loewen testified that he was approached by owners of three of the mobilehomes in spaces 1 through 142 with complaints about the situation, and he told those owners that they could stay in their spaces without the dramatic increase in their rent. The evidence on the subject was poorly developed at trial, but according to Loewen's testimony, the reason that he did not raise the rent for the mobilehomes that ended up staying in spaces 1 through 142 was that "I couldn't change the rent. It had to be approved by the county." Loewen also testified that if Golden would have contacted him to ask to stay on space 47 at the same rental rate, Loewen would have agreed because "[t]hat was my agreement with the county." Apart from these brief statements by Loewen at trial, the record provides no information concerning Loewen's "agreement with the county" about not raising the rent for the mobilehomes that stayed on spaces 1 through 142. It is not clear whether the agreement was made before or after Loewen sent Golden the July 7 letter stating that Golden's rent would increase to the KOA daily RV rate on November 1, 2007.

In April 2008, Golden filed a lawsuit against Loewen.[3] Sassy's Outback was later added as a defendant. The complaint alleged causes of action for (1) violation of the MRL, (2) fraud and (3) negligent misrepresentation.

---

[3] Golden also sued Imperial Hot Mineral Spa, Inc., and obtained entry of default as to that party. According to Loewen's testimony, Imperial Hot Mineral Spa, Inc. is a defunct corporation.

The cause of action for violation of the MRL was based on the theory that Golden's tenancy in space 47 of the Park had been terminated without following the procedures required by MRL. Specifically, Golden alleged that his tenancy had been terminated based on a change of use of the Park, as defined in section 798.10, but that defendants had not complied with the requirements for terminating a tenancy based on a change of use pursuant to section 798.56, subdivision (g).

The causes of action for fraud and negligent misrepresentation were both based on the allegation that defendants had misrepresented that they "had the required approval(s) from the County of Imperial to close space #47 and convert it to an RV space" and "[t]hat plaintiff was required to move or remove his mobilehome from space 47 at his own expense on or before November 1, 2007."

The case proceeded to a bench trial at which Golden called several witnesses to testify, including Loewen and himself. At the close of Golden's evidence, the defendants made a motion for judgment under Code of Civil Procedure section 631.8. The trial court granted the motion.

Explaining its ruling on the MRL cause of action, the trial court stated, among other things, "I find no sufficient evidence to support a claim that Mr. Golden was a displaced tenant within the meaning of the MRL . . . . I'm not going to say that Mr. Golden moved voluntarily . . . . But I also find no evidence to support a claim that he was forced to move or was a displaced tenant . . . ."

With respect to the fraud and negligent misrepresentation causes of action, the trial court explained that "nothing in [the July 7 letter] reflects that allegedly fraudulent

6

representation, that Mr. Loewen allegedly misrepresented that he had approval to close space 47. . . . Not even an inference can be drawn from this. And as a result, . . . any alleged misrepresentation that Mr. Golden individually was required to move from space 47 at his own expense, I simply don't find evidence to support that, nor even an inference from it."

On November 20, 2012, the trial court entered judgment in favor of Loewen and Sassy's Outback. Golden filed a notice of appeal on December 19, 2012. Two days later, the trial court issued an order awarding attorney fees to Loewen and Sassy's Outback in the amount of $43,515 under the attorney fee provision in the MRL (§ 798.85). Golden did not file a notice of appeal from the attorney fee award.

II

DISCUSSION

The sole issue we consider is whether the trial court erred in granting the motion for judgment pursuant to Code of Civil Procedure section 631.8 in favor of defendants.[4]

---

[4]    In the conclusion sections to his opening brief and reply brief, Golden states that he is also seeking a reversal of the attorney fee award. However, that challenge is not properly before us, as Golden did not file a notice of appeal from the attorney fee award. Further, even if Golden had properly appealed from the attorney fee award, we would reject it because Golden has presented no substantive argument in the body of his appellate brief as to why the attorney fee award was in error. We note also that in the conclusion section of his appellate brief, Golden makes the unsupported statement that the trial court abused its discretion by not admitting certain exhibits into evidence. We will not consider an undeveloped argument that is not set forth in the body of the brief and is unsupported by authority or citations to the record. (See *Wright v. City of Los Angeles* (2001) 93 Cal.App.4th 683, 689 ["Generally, asserted grounds for appeal that are unsupported by any citation to authority and that merely complain of error without

A. *Legal Standards Applicable to a Judgment Granted Pursuant to Code of Civil Procedure Section 631.8*

Code of Civil Procedure section 631.8, subdivision (a) provides in relevant part: "After a party has completed his presentation of evidence in a trial by the court, the other party . . . may move for a judgment. The court as trier of the facts shall weigh the evidence and may render a judgment in favor of the moving party, in which case the court shall make a statement of decision as provided in Sections 632 and 634, or may decline to render any judgment until the close of all the evidence."[5]

"The standard of review of a judgment and its underlying findings entered pursuant to [Code of Civil Procedure] section 631.8 is the same as a judgment granted after a trial in which evidence was produced by both sides. In other words, the findings supporting such a judgment 'are entitled to the same respect on appeal as are any other findings of a trial court, and are not erroneous if supported by substantial evidence.' . . . Consequently, where a trial court's factual finding is challenged on the ground there is no substantial evidence to sustain it, the power of the reviewing court begins and ends with the determination as to whether, on the whole record, there is substantial evidence, contradicted or uncontradicted, that will support the trial court's determination. [¶] The appellate court views the evidence in the light most favorable to the respondents . . . ,

---

presenting a coherent legal argument are deemed abandoned and unworthy of discussion."].)

[5] Here, the trial court granted the motion pursuant to Code of Civil Procedure section 631.8, but did not issue a written statement of decision as directed by the statute. We accordingly focus on the trial court's findings set forth orally on the record.

8

resolves all evidentiary conflicts in favor of the prevailing party and indulges all reasonable inferences possible to uphold the trial court's findings . . . . [T]he appellate court is not bound by a trial court's interpretation of the law based on undisputed facts, but rather is free to draw its own conclusion of law." (*San Diego Metropolitan Transit Development Bd. v. Handlery Hotel, Inc.* (1999) 73 Cal.App.4th 517, 528-529, citations omitted.)

B. *The Cause of Action for Violation of the MRL*

We first consider whether substantial evidence supports the trial court's judgment on Golden's cause of action alleging violation of the MRL.

" 'In California, mobilehome tenancies are governed by the [MRL]. [Citation.] The law "extensively regulates the landlord-tenant relationship between mobilehome park owners and residents." [Citation.] [¶] The protections afforded by the [MRL] reflect legislative recognition of the unique nature of mobilehome tenancies. [Citation.] Ordinarily, mobilehome park tenants own their homes but rent the spaces they occupy. [Citation.] Once a mobilehome is in place in a park, it is difficult to relocate. [Citations.] Its owner thus "is more likely to be a long-term resident." [Citation.] . . . The MRL provides 'homeowners a measure of stability and predictability in their mobilehome park residency . . . .' " (*SC Manufactured Homes, Inc. v. Canyon View Estates, Inc.* (2007) 148 Cal.App.4th 663, 673.)

The MRL contains provisions protecting against termination of a tenancy in a mobilehome park except in a limited number of specific circumstances set forth in the MRL. (§§ 798.55, subd. (b)(1), 798.56.) These circumstances include certain types of

9

misconduct or noncompliance by the mobilehome owner or tenant, nonpayment of rent, condemnation of the mobilehome park, or — as relevant here — change of use of the park. (§ 798.56, subds. (a)-(g).)

However, the MRL does not control the rent that a mobilehome park operator may charge. (*Cacho v. Boudreau* (2007) 40 Cal.4th 341, 350 ["Despite its various limitations on allowable fees, the state [MRL] does not restrict the amount of rent that a mobilehome park owner may charge park residents; it is not a rent control law."].) Further, the lease that Golden entered into for space 47 permits the rent to be raised upon 90 days' notice, which was complied with here. Accordingly, Golden has not pursued a claim under the MRL based on the fact that defendants gave him notice in the July 7 letter that they would be raising the rent on November 1, 2007. Instead, Golden contends that defendants violated the MRL because the July 7 letter served *to terminate his tenancy* in space 47 but that the termination was not carried out in compliance with the MRL.

Golden contends that the July 7 letter threatened to terminate his tenancy based on a "[c]hange of use of the park or any portion thereof" (§ 798.56, subd. (g)), which — as we have explained — is one of the permissible grounds for terminating a tenancy. As Golden points out, a tenancy may be terminated based on a change of use of the park only by compliance with certain procedures. Among other things, when a governmental permit is *not* required for the change of use of the park, the park's operator must give 12 months' notice to the tenants that their tenancy will be terminated. (§ 798.56, subd. (g)(2).) If a governmental permit *is* required, the park's operator must give 15 days' notice to the tenants prior to appearing before the governmental agency to request the

10

permit and then must give six months' notice of termination of the tenancy after the permit is obtained. (§ 798.56, subd. (g)(1), (2).) Further, the MRL states that when terminating a tenancy based on a change of use of the park, the park's operator must comply with Government Code section 65863.7, which requires the preparation and distribution of a tenant impact report addressing the impact on the displaced tenants and the availability of adequate replacement housing. (§ 798.56, subds. (g) & (h); Gov. Code, § 65863.7; see *Keh v. Walters* (1997) 55 Cal.App.4th 1522, 1526 [describing the role of a tenant impact report upon change of use of a park].) Golden contends that defendants terminated his tenancy based on a change of use of the Park but did not comply with the MRL's requirement that he be given adequate notice and receive a tenant impact report. As the trial court correctly observed, there are two problems with Golden's claim that defendants violated the MRL by not following the procedures for terminating a tenancy based on a change of use of the Park.

First, the trial court reasonably found based on the evidence at trial that the July 7 letter did not threaten a termination of Golden's tenancy. Instead, according to the July 7 letter, Golden would be permitted to stay in space 47, but his rent would increase as of November 1, 2007. Indeed, at trial, Golden testified to exactly that understanding of the July 7 letter. "My understanding was that I had to go to the permanent home section or be charged an enormous amount of money . . . ." Another witness called by Golden at trial — Jim Kaness — who moved to a different space after receiving the July 7 letter, testified to the same understanding. He stated, "My understanding was that if I stayed in space 5 and did not move that I would, as the letter says, have to pay the KOA daily rate,

11

which, my understanding, was going to be $900 a month." Accordingly, as Golden's tenancy was not terminated, the statutory requirements in the MRL governing termination of a tenancy do not apply here.

Second, as the trial court reasonably found based on the evidence, even had Golden's tenancy been terminated, the provisions in the MRL governing termination of tenancy caused by a *change of use* of the Park cannot not apply here because there was no change of use. The MRL states that a change of use means "a use of the park for a purpose other than the rental, or the holding out for rent, of two or more mobilehome sites to accommodate mobilehomes used for human habitation, and does not mean the adoption, amendment or repeal of a park rule or regulation. A change of use may affect an entire park or any portion thereof." (§ 798.10.) Here, the evidence showed that there was no change of use of the Park. As the July 7 letter stated, the Park would still house mobilehomes. Further, there was no change of use of the *portion* of the Park containing space 47, as the July 7 letter communicated that space 47 would be still be available to accommodate mobilehomes, providing that the new rental rate was paid.[6]

---

[6]     Golden contends that the trial court erred by choosing not to give weight to the testimony of Brian Donley, who is a manager in the County of Imperial building department, and whose testimony touched on issues pertaining to whether there was a change of use of the Park. We perceive no error. As the finder of fact, the trial court was entitled to make credibility determinations regarding Donley. (*People v. Jones* (1990) 51 Cal.3d 294, 314 [in review for substantial evidence, "it is the exclusive province of the trial judge or jury to determine the credibility of a witness," and "we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder"].) The trial court reasonably explained that it was giving little weight to Donley's testimony concerning whether there was change of use of the Park because Donley stated that he was not very knowledgeable concerning the MRL.

12

In sum, because the evidence supported findings that there was neither a termination of tenancy nor a change of use of the Park, substantial evidence supports the trial court's finding against Golden on his cause of action for violation of the MRL.

C.     *The Causes of Action for Fraud and Negligent Misrepresentation*

Golden's causes of action for fraud and negligent misrepresentation were based on the theory that defendants made two alleged misrepresentations that caused Golden to move his mobilehome from space 47 to space 180. As we will explain, the trial court reasonably found, based on the evidence, that defendants did not make either of the alleged misrepresentations.

First, as the complaint alleges, defendants purportedly represented that they "had the required approval(s) from the County of Imperial to close space #47 and convert it to an RV space." As the trial court explained, the evidence at trial did not support a finding that defendants made that representation to Golden. The July 7 letter, which the evidence showed was the only relevant communication between Golden and defendants, does not state that space 47 is going to be closed and converted to an RV space. Instead, the July 7 letter gave Golden the opportunity to stay in space 47 with his mobilehome if he paid the new increased rental rate. Further, the July 7 letter does not state that defendants obtained permission from the County of Imperial for the changes to spaces 1 through 142.

Second, the other alleged misrepresentation was that Golden "was required to move or remove his mobilehome from space 47 at his own expense on or before November 1, 2007." As the evidence at trial established, defendants did not make that

13

statement to Golden.  As shown by the July 7 letter, and as confirmed by Golden's testimony describing his understanding of that letter, Golden was not told that he had to move from space 47.  Instead Golden was informed that if he stayed in space 47, his rent would increase as of November 1, 2007, and based on that statement Golden decided to move to space 180.[7]

In sum, substantial evidence supports the trial court's finding that defendants did not make the alleged misrepresentations that formed the basis for Golden's fraud and negligent misrepresentation causes of action.

---

[7]     We note that the evidence at trial briefly touched on a possible lack of communication between Loewen and Golden regarding whether Golden could have obtained relief from the rent increase if he decided to keep his mobilehome in space 47, but the evidence on that issue was not well developed at trial and Golden has not focused on those facts as a basis for his fraud and negligent misrepresentation claims.  Indeed, neither at trial nor in his appellate briefing did Golden pursue a fraud or negligent misrepresentation claim based on possible misrepresentations made by Loewen about the planned November 1, 2007 rent increase for spaces 1 through 142, and we accordingly do not consider the issue.

DISPOSITION

The judgment is affirmed.

_____
IRION, J.

WE CONCUR:

_____
NARES, Acting P. J.

_____
AARON, J.